[No. 1646.]

## GEORGE STERLING *v.* THE STATE.

1. COPY OF SPECIAL VENIRE—PRACTICE —Defendant in a capital case is entitled to a copy of the special venire summoned by virtue of the writ, but it is not necessary that the copy served on him shall set out the sheriff's return on the original writ. Even if the return was necessary to the copy, it was not error to allow the State to have the copy amended by supplying the sheriff's signature to his return.
2. JURY LAW.—After a juror has been sworn and impaneled in a felony case, the court has no authority to excuse or discharge him, without the defendant's personal consent. If sickness or accident renders it impracticable to proceed with the jury as constituted, the only course open to the court, without such consent, is to discharge the jury and organize another one
3. PREVENTION OF OFFENSES BY PRIVATE PERSONS.—In repelling an aggression, the same rules which regulate the conduct of a person about to be injured are applicable to the conduct of another who interferes in behalf of such person.
4. SAME—MURDER—CHARGE OF THE COURT—CASE STATED.—In a trial for murder there was proof that the deceased, in the night time, with a half-opened pocket knife in one hand and a green stick in the other, stopped the defendant and his female companion, and, after vilifying the woman, struck her across the face with a stick. Defendant took her part, and a quarrel instantly ensued between him and the deceased, who was much the stouter man of the two, and who stood with his stick drawn back as if to strike the woman again. Defendant drew his pistol and fired one shot over the head of the deceased, who nevertheless maintained his menacing attitude and conduct, and then the defendant fired and killed him. *Held,* that this proof made it incumbent on the trial court to give in charge to the jury the law applicable to the interference of one person in defense of another. The charge should not, by ignoring this state of proof, have in effect limited the defendant's justification to the defense of his own person.
5. MANSLAUGHTER—"ADEQUATE CAUSE."—The instances given in the Penal Code of such adequate cause as will mitigate culpable homicide from murder to manslaughter do not comprise all the circumstances which may constitute such adequate cause.
6. PRACTICE.—Vituperation of parties and witnesses, when unwarranted by evidence, is a practice too frequently indulged in by counsel, and one which should be promptly suppressed by the trial courts, especially in cases involving life or liberty. Note the animadversions of this court upon this reprehensible practice.

APPEAL from the District Court of Fort Bend. Tried below before the Hon. W. H. Burkhart.

The indictment was presented on April 25, 1883, and charged that George Sterling, the appellant, did, on the fourth of March, 1883, with express malice aforethought, kill one Shed Oliver by shooting him with a pistol. At the autumn term of the court the cause was tried, and the appellant was found guilty of murder in the second degree, with a term of five years in the penitentiary assessed as his punishment.

. Deceased and defendant, and all the witnesses to the homicide were negroes. The encounter which resulted in Oliver's death occurred suddenly about the middle of the night of March 4, 1883, in the county of Fort Bend.

Melinda Johnson was the first and principal witness introduced by the State. She testified that on the night of the homicide she went to a party at Jeff. Curry's, on the Lamar plantation. George Sterling, the defendant, and Shed Oliver, the deceased, were both at the party. About the time the party broke up, at twelve or one o'clock, the witness requested the defendant to accompany her to her home, which was on his route to his own. He consented to do so, and they left the house together. They had progressed but a short distance on the road when Shed Oliver, the deceased, walked out in front of them and cut a stick. He then came back and walked up in front of the witness, stopping her and the defendant, and asked witness, "What sort of a d—n lie was that you told me?" and then he struck witness across the face with the stick he had cut. Defendant spoke up and said: "You don't have to hit my company," or "the company I am walking with." Then the deceased said to the defendant: "If you don't like it, help yourself." Defendant replied: "I can help myself," and drew his pistol and fired it in the air, over the head of the deceased. Then the deceased said: "You d—n coward, you are afraid to shoot me; you have not got the nerve, you son of a bitch; you only shoot to scare." The defendant replied: "I ain't, haven't I? I'll show you if I haven't got the nerve," and he then shot the second time, striking the deceased in the face, and the deceased fell to the ground. After the deceased struck witness with the stick, he stood with his knife half open in his hand, and in the other he held the stick, drawn back and about to strike her again; and then it was that the defendant spoke to him as already stated. Witness,

when struck by the deceased, had her arm in the defendant's. The two shots followed each other in quick succession. There were but two shots. It all occurred in the night, but the defendant had a lantern, and it enabled witness to see the deceased and everything that occurred. Defendant, after he shot the deceased, gave the lantern to George Martin, and went off in another direction, and witness went on home by herself. The day before the party the deceased asked witness if she was going to it, and she told him she did not think she would go. He wanted her to go, and not to go with anybody but him, and she told him that if she went she would go with whoever she pleased; that she did not have to ask him who she should go with to a party. Deceased replied to witness with an oath. This was what he alluded to when he asked what sort of a d—n lie was that she had told him. During the dance at Jeff. Curry's the deceased danced up to witness a dance called the "Indian Mollie" dance, which is a whore's dance; and she became offended at him for dancing it up to her. She felt insulted, and told him so. This was the reason she wished to leave the party. The "Indian Mollie" dance is a vulgar dance. Deceased was a large man—a much larger man than the defendant, who was not his equal physically. The stick with which the deceased struck witness was as large as a good sized walking stick, and was green. The blow she received was a severe one, and pained her considerably. It was a hard lick. Both the deceased and the defendant were married men, but the defendant claimed to be separated from his wife. Witness also had been married, but she was separated from her husband when Oliver was killed. She did not go the party at Jeff. Curry's with either the deceased or the defendant, but in company with another man and his wife. The night of the homicide was a dark and drizzly night, but witness knew that the defendant had a lantern, and, as they lived near each other in the town of Richmond, she requested his protection to her home. From the time the deceased struck the witness until he was shot and fell, everything happened very quickly, and in less time than she could relate it. The deceased and the defendant were from three to five feet apart.

Wash. Hays, for the State, testified that he was at Jeff. Curry's the night Shed Oliver was killed. As witness was leaving the house, he heard a lick; and then he heard Shed Oliver say: "What did you tell me that lie for?" and then he heard defendant say: "You don't have to hit my company." Then the

deceased said: "If you don't like it, help yourself, you d—n son of a bitch." The defendant replied: "You hit my company, and if you hit her again I will kill you, you G—d d—n son of a bitch." Then the deceased said: "You have the advantage of me. I will see you another time." Defendant replied: "Yes, I have the advantage of you; and if you hit my company again, I'll blow your lights out." Witness then heard a shot; and then the deceased said: "You shot, but you didn't try to hit anything." Defendant replied: "I didn't, hey?" and then there was another shot, and the deceased stumbled and fell backwards. Defendant then walked around the deceased, fired twice more, blew out the lantern, and walked off. Defendant's first shot was fired in the air, over deceased's head.

Two other witnesses testified for the State. With slight variations, their testimony concurred substantially with that already related. One of them went up to the deceased immediately after the latter fell, and found him lying on his back. He had been shot in the corner of his eye, and died in about two hours. When this witness got to the deceased, there was a pocket knife, half open, lying by his left side. Witness also saw the stick. It was a green China stick, about two feet long, and about as thick as the finger of the witness, who was a large and athletic freedman. Deceased was a large and muscular man, and greatly superior to the defendant in size and strength.

The defense proved an excellent character for the appellant as a peaceable and well disposed man. He had been for years a house servant of one of the witnesses.

*Peareson & McCamly,* for the appellant: 1. An actual attack upon a female under the protection of a man is a stronger cause to produce the degree of anger, rage and resentment which renders the mind incapable of cool reflection, than insulting words or conduct; that is, if there could be any difference.

2. The statute, by making insulting words and conduct adequate cause, does not mean to exclude an actual assault on the female as adequate cause. If a man may kill to save another man from violence, surely he may do the same for a woman.

3. An assault causing pain to the woman, or an assault on defendant causing pain to him, would be "adequate cause" to either party assaulted, as the case might be. (Penal Code, Art. 697). It is fundamental that what one may do for himself he may do for another; and what one may do for himself, another

may do for him.  So in this case the defendant had a right to act, both for the woman and for himself; he had the rights of the man to protect the woman, and the rights of the woman to protect and defend herself.

4.  All these rights, as applicable to the facts of this case, and as tending to mitigate the homicide and reduce it to man-slaughter, should have been submitted by the court to the jury in appropriate charges.  It was the judge's duty to do this un-asked.

The only " adequate cause " presented by the charge is that of " insulting words or conduct," toward the female under the man's protection.  And the learned judge concludes this part of his charge by saying, " As to what is meant by  *    *    * adequate cause, you are herein fully charged," thereby exclud-ing from the minds of the jury the consideration of any other adequate cause in this case than insulting words or conduct to-ward the female.  But for this restriction the instincts of the jury would probably have led them to the right conclusion.

The testimony of the woman herself is, that she had asked de-fendant's protection to take her to her home, and was on her way there in company with defendant, when deceased passed them, cut a stick, returned, confronted and stopped them, and after insulting her, struck her across the face and head with the stick, causing her pain by the blow, and stood with the stick drawn back to repeat the blow, when he was shot.  She further stated that the entire occurrence took place very rapidly.

If the female was a whore, as asserted by the district attorney, the insults might pass unnoticed, while the blows would pain and frighten or enrage her, as they would any other animal. (Penal Code, Art. 697; 2 Bishop, 581; *Johnson* v. *The State*, 5 Texas Ct. App., 47; *Kemp* v. *The State*, 11 Texas Ct. App., 202; *Mackey* v. *The State*, 13 Texas Ct App., 363; Whart. Hom., 230; *Hill* v. *The State*, 8 Texas Ct. App., 142; *Tickle* v. *The State*, 6 Texas Ct. App., 623; *Neyland* v *The State*, 13 Texas Ct. App., 550; *Kemp* v. *The State*, 13 Texas Ct. App., 561.)

An attack insufficient to justify homicide might nevertheless mitigate it to manslaughter.  This issue is obscured by the gen-eral charge.

An attack justifying a charge on self-defense, as given in this case, would seem necessarily to include such a state of facts as would require a charge on manslaughter, as based on resistance to an attack on the person.  (*Williams* v. *The State*, 7 Texas Ct.

App., 396; *Jennings* v. *The State*, 7 Texas Ct. App., 350; *West* v. *The State*, 2 Texas Ct. App., 460.)

In cases of homicide in protection of, in defense of, or in behalf of another, all the law applicable to such a state of facts should be plainly given to the jury, separate from and in addition to the general law of murder, manslaughter and defense of one's own person. Homicide in defense of another is part of the law of self-defense, requiring separate instructions according to the very facts of the particular case.

It was the duty of the judge in this case to explain to the jury that defendant had the same right to defend the person of the woman from serious bodily harm, from murder, or from maiming, as he had to defend himself, or as she had to defend herself, and that homicide, in defending her under a reasonable apprehension of death or serious bodily harm, or to prevent deceased from murdering or maiming her, was justifiable.

The facts demanded at the hands of the judge, as a part of his voluntary duty to the accused, a full, explicit and careful charge upon the law of defense of the person of another, that other being of the weaker sex, and one who had called on the stronger for protection from violence.

Yet the only mention made of the female in the whole charge is where the jury are told that to kill a man for insulting a woman is manslaughter. They doubtless concluded that beating a woman was allowable under the laws of Texas, and that while a man might defend himself from assault, he might not defend the woman. This seems the reasonable deduction from a charge which speaks at some length of defending one's own person, when the facts raise a bare possibility of an attack on that person, but preserves a profound silence as to defending another who was actually assaulted and beaten. (2 Bishop, 581; Wharton on Homicide, 230; *Dyson* v. *The State*, 13 Texas Ct. App., 402; Webb's Dig., 598; *Johnson* v. *The State*, 5 Texas Ct. App., 47; *Kemp* v. *The State*, 11 Texas Ct. App., 202; 13 Texas Ct. App., 561; *King* v. *The State*, 13 Texas Ct. App., 280.)

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. A copy of the sheriff's return upon the special venire. certified to by the clerk, was served upon the defendant one day before the trial, which copy contained a list of the names of persons summoned to serve as jurors on the trial

of the case. In preparing this copy the clerk omitted to copy the official signature of the sheriff, which appeared upon the return. Defendant moved to quash the service of the copy had upon him, because the copy was not a true one. Thereupon the court permitted the clerk to amend the copy by adding thereto the official signature of the sheriff as it appeared upon the return on the venire, and overruled defendant's motion to quash; which action of the court was excepted to, and is claimed by defendant to be error.

We are of the opinion that there was a substantial compliance with the law in serving the defendant with a list of the names of persons summoned on the special venire. (Code Crim. Proc., Arts. 616, 617.) It was not required of the clerk to make a copy of the sheriff's return upon the venire, but merely a copy of the list of names of persons summoned by virtue of the writ. It was not material, therefore, that he should attach to the copy the official signature of the sheriff; but, even if this had been necessary, it was not error to permit him to amend by attaching such signature. (*Washington* v. *The State*, 8 Texas Ct. App., 377.)

2. It is made to appear, by a bill of exceptions, that after six jurors had been sworn and impaneled in the case, the court announced its intention of adjourning until the next morning, whereupon one of the six jurors impaneled, J. McFarlane, made known to the court that his family were very ill, and needed his attention that night, and requested the court to be allowed to go home and remain with his family during the night. Defendant and his counsel agreed that the juror might go home and remain during the night with his family, in charge of an officer; but the court would not allow this, but remarked: "If you will all agree to the discharge of McFarlane, he may be discharged," the attorneys for the defendant and the defendant himself all being present and near together. Defendant's attorneys spoke in reply to the court, and agreed that the juror might be discharged, and the defendant made no objection, and the juror was discharged.

It has been settled by the decisions of this court that when a juror has been sworn in a capital case he is impaneled, and must remain upon the jury to the termination of the trial. The court has no power to excuse a juror impaneled in a felony case. In case of sickness or accident rendering it impracticable to proceed with the trial of the case before the jury as then consti-

tuted, the only course the court can take is to discharge the jury and to proceed to form another. (*Hill* v. *The State*, 10 Texas Ct. of App., 618; *Ellison* v. *The State*, 12 Texas Ct. App., 557.) True, the defendant might waive the provisions of the law re quiring jurors impaneled to be kept together until the termination of the trial, etc. (Code Crim. Proc., Art. 23); but such waiver must be expressly made by the defendant himself, and cannot be made by his counsel so as to bind him, nor can his mere silence or failure to object be construed to be a waiver by him. (*Early* v. *The State*, 1 Texas Ct. App., 248; *Hill* v. *The State*, 10 Texas Ct. App., 618.) We think the court erred in discharging the juror McFarlane.

3. Several objections are urged to the charge of the court. In the main we think the charge is correct, but in some particulars we consider it imperfect and incomplete when viewed with reference to the facts of the case. Defendant was walking with Melinda Johnson, a woman who had requested him to act as her escort home from a party. Deceased approached this woman in an angry, abusive and violent manner, and struck her on the head with a stick, and was threatening to strike her again with the stick when the defendant shot and killed him. This occurred in the night. The stick used by the deceased in inflicting the battery upon the woman was as large as a good sized walking stick, and was green wood. Deceased also at the time of assaulting the woman had a knife in his hand. This state of facts, we think, demanded from the court an instruction explaining the rules of law applicable to the interference of a person in defense of one who is unlawfully and violently attacked by another. If the circumstances were such as to make it reasonably appear to the defendant that the deceased was making, or about then to make, an unlawful and violent attack upon Melinda Johnson, with the intent to do her serious bodily injury, and, acting under the belief that such was the intent of deceased, he shot and killed deceased, it would have been justifiable homicide. The same rules which regulate the conduct of a person about to be injured, in repelling an aggression, are applicable to the conduct of him who interferes in behalf of such person. (Code Crim. Proc., Art. 86.)

While the charge of the court presented to the jury the law of self-defense as it was applicable to an attack made upon defendant, it entirely omitted to explain the law with reference to his right to repel an attack upon his companion, Melinda John-

son, when the evidence showed that the attack by the deceased was made upon Melinda, and not upon defendant.

4. Again, in charging upon manslaughter, the effect of the charge as framed, in explaining "adequate cause," would, it seems to us, be to impress the minds of the jury with the belief that "adequate cause" in this case was limited to insulting words or conduct to a female. We think the jury should have been further told that if they believed from the evidence that adequate cause, other than that specially named, actuated the killing, it would reduce the homicide to manslaughter. Adequate cause is not confined to the instances enumerated in the statute, but may exist in numerous others. (*Guffee* v. *The State*, 8 Texas Ct. App., 187.)

5. By a bill of exceptions we are informed that the district attorney, in his closing argument to the jury, made use of some very harsh language toward the woman Melinda Johnson, who had testified as a witness in the case in behalf of the State. He denounced her as a whore, a prostitute, a notorious strumpet. There is no evidence in the record which justified these denunciations of the witness. These remarks of the district attorney were not excepted to by defendant at the time, nor did the court interpose to stop them, and, as far as possible, remove from the minds of the jury the injurious effects which they might have produced. As far as we can perceive from the evidence in the case, the opprobious epithets used by the district attorney with reference to Melinda Johnson were wholly unwarranted and uncalled for, and were in our judgment very reprehensible and well calculated to excite the passions and arouse the prejudices of the jury, not only against the witness but against the defendant. It was no justification of the remarks that Melinda Johnson and the defendant were negroes. They have the same right to the protection of the law that other people have, and should be dealt with by courts and counsel in the trial of causes in the same manner as other citizens are dealt with, in so far as their legal rights are involved. It is a practice altogether too common for counsel to indulge in personal remarks reflecting upon the character of parties and witnesses, when such remarks are not justified by any testimony in the case. Such remarks should always be promptly suppressed and condemned by the court, and especially in cases involving the life or liberty of the citizen.

It should always be the purpose of a court, and of counsel en-

gaged in the trial of a cause, to try *the case*, and not the individuals connected with it as parties or witnesses. We have made these remarks in no spirit of censure toward the learned judge and able district attorney who tried this case, but our purpose is to condemn a practice which is by no means unusual, and to call attention to it, that it may be, as far as possible, discountenanced and discontinued.

Because of the errors we have noticed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered December 5, 1883.